Slip Op 14 - 112

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS COALITION, | |
| Plaintiff, | |
| v. | Before: R. Kenton Musgrave, Senior Judge |
| UNITED STATES, | Court No. 13-00241 |
| Defendant, | |
| and | |
| BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, GANG YAN DIAMOND PRODUCTS, INC., CLIFF INTERNATIONAL LTD., HUSQVARNA CONSTRUCTION PRODUCTS NORTH AMERICA, INC., HEBEI HUSQVARNA-JIKAI DIAMOND TOOLS CO., LTD., WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., BOSUN TOOLS CO., LTD., and BOSUN TOOLS INC., | |
| Defendant-Intervenors. | |

**OPINION AND ORDER**

[Remanding second administrative review of antidumping duty order on diamond sawblades and parts thereof from the People's Republic of China.]

Dated:  September 23, 2014

  *Daniel B. Pickard* and *Maureen E. Thorson*, Wiley, Rein & Fielding, LLP, of Washington, DC, for plaintiff.

  *Alexander V. Sverdlov*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant.  With him on the brief were *Stuart F.*

*Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White*, *Jr.*, Assistant Director. Of Counsel on the brief was *Nathaniel J. Halvorson*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Jeffrey S. Neeley* and *Michael S. Holton*, Hush Blackwell, LLP, of Washington, DC, for defendant-intervenors Beijing Gang Yan Diamond Products Company, Gang Yan Diamond Products, Inc., and Cliff International Ltd.

*John D. Greenwald*, *Robert C. Cassidy*, *Jr.*, and *Thomas M. Beline,* Cassidy Levy Kent (USA) LLP, of Washington, DC, for defendant-intervenors Husqvarna Construction Products North America and Hebei Husqvarna-Jikai Diamond Tools Co., Ltd.

*Max F. Shutzman* and *Dharmendra N. Choudhary*, Grunfeld, Desiderio, Lebowitz, Silverman & Kledstadt, LLP, of Washington, DC, for defendant-intervenor Weihai Xiangguang Mechanical Industrial Co., Ltd.

*Gregory S. Menegaz* and *J. Kevin Horgan*, deKeiffer & Horgan, of Washington, DC, for defendant-intervenors Bosun Tools, Co., Ltd. and Bosun Tools Inc.

Musgrave, Senior Judge: This opinion considers the motion of plaintiff Diamond Sawblades Manufacturers Coalition ("DSMC") for judgment on *Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 36166 (Jun. 17, 2013) ("*Second Review*"), PDoc 471, *amended* 78 Fed. Reg. 42930 (Jul. 18, 2013) ("*Amended AR2 Final*"), PDoc 487, and accompanying issues and decision memorandum ("I&D Memo") (July 11, 2014), PDoc 455. The complaint challenges these determinations: (I) to grant a separate rate to the "AT&M entity"[1] and not to collapse the AT&M entity with its parent, the China Iron & Steel Research Group ("CISRI"), and assign the

---

[1] The AT&M entity comprises a "collapsed" group of related companies, *see* 19 C.F.R. § 351.401(f), including Beijing Gang Yan Diamond Products ("BGY"), its direct parent, Advanced Technology & Materials Co., Ltd. ("AT&M"), and two sister companies, HXF Saw Co., Ltd. (formerly Yichang HXF Circular Saw Industrial Co., Ltd.), and AT&M International Trading, Inc.

collapsed entity the 164.09% PRC-wide margin, and the effect of the foregoing on the margin for non-selected separate rate respondents; (II) to reject the DSMC's targeted dumping allegation against Weihai Xiangguang Mechanical Industrial Co., Ltd. ("Weihai"); and (III) to alter the preliminary methodology used to value steel sawblade cores used in Weihai's production.

Jurisdiction is here pursuant to 28 U.S.C. §1581(c). Administrative determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law" are to be held unlawful. 19 U.S.C. §1516a(b)(1)(B)(i). The matter is remanded as follows.

I

In light of the current posture of *Advanced Technology & Materials Co. v. United States*, 37 CIT ___, 938 F. Supp. 2d 1342 (2013), *appeal docketed*, No. 14-1154 (Fed. Cir. Dec. 9, 2013), which sustained an administrative determination of separate-rate ineligibility[2] with respect to the AT&M entity during the investigation phase, the defendant requests voluntary remand to reconsider the AT&M entity's separate rate determination and the related issues of collapsing "and the calculation of the all-others rate." Def's Resp. at 7.

Commerce may request remand, without confessing error, in order to reconsider its previous position. If the "concern is substantial and legitimate, a remand is usually appropriate." *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001). Certain non-selected separate rate ("NSSR") respondents, namely Husqvarna Construction Products North America, Hebei

---

[2] In administering the antidumping law, Commerce presumes that the operations of companies within a non-market economy are government-controlled and therefore distorted. *See* Import Administration Policy Bulletin 05.1 (Dep't of Comm. Apr. 5, 2005). A non-market economy company may be determined eligible to receive a separate rate if it rebuts this presumption by demonstrating an absence of *de jure* and *de facto* governmental control over its operations. *Id*.

Husqvarna-Jikai Diamond Tools Co., Ltd., Bosun Tools Co., Ltd. and Bosun Tools Inc., defendant-intervenors here, oppose the voluntary remand request as overbroad. They argue Commerce cannot lawfully alter and apply a margin to them that differs from the zero percent separate rate margin determined for them, ultimately pursuant to the *Amended AR2 Final*.

While facially innocuous, Commerce's remand request implicates the determination of the "all-others" margin as aforesaid. Pursuant to 19 U.S.C. §1673d(c)(5), for companies entitled to a separate rate that margin is equal to the weighted-average of margins determined for exporters and producers individually investigated, excluding any margins based on adverse inferences or *de minimis*. For exporters and producers not individually investigated, Commerce "may use any reasonable method to establish the estimated all-others rate". 19 U.S.C. §1673d(c)(5)(B). In the original investigation, upon finding that the mandatory respondents both received zero margins, Commerce's "reasonable method" for determining the all-others margin was "to average the weighted-average dumping margins calculated for the selected respondents." *Amended AR2 Final*, 78 Fed. Reg. at 42931. Reconsideration of the AT&M entity's eligibility for a separate margin rate necessary implicates the all-others rate.

The court finds that Commerce has here expressed a substantial and legitimate concern for reconsidering the AT&M entity's separate rate issues pertinent to this matter insofar as *Advanced Technology* addressed the same issues and nearly identical facts that are contested in the complaint regarding the AT&M entity. The NSSR respondents' arguments against alteration of the PRC-wide margin, in the context of voluntary remand of those issues concerning the AT&M entity's entitlement to a separate rate, does not provide a basis for denying Commerce's request since, as

mentioned, any determination that the AT&M entity is ineligible for a separate rate would implicate the NSSR margin calculation process, which is necessarily derivative. The separate rate issues, including their impact on derivative issues, are therefore, and hereby, remanded.[3]

II

The DSMC also challenge Commerce's rejection of their targeted dumping "allegation" against Weihai as "late" and "prejudicial". *See Second Review* I&D Memo at 15.

A

By way of background, in 2012 Commerce announced that for administrative reviews to be processed, after April 16, 2012 the "typical" margin determination would be based upon a comparison (without the application of "zeroing") of monthly weighted-average export prices ("EP") or constructed export prices ("CEP"), as applicable, with monthly weighted-average normal values ("A-A" methodology). *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings*, 77 Fed. Reg. 8101, 8102 (Feb. 14, 2012) (final modification). Announcement of new default methodology was a significant departure from employment of the traditional "A-T" (average-to-transaction) methodology. Resort to "alternative" methodology, now including A-T, along with the rarely-used transaction-to-transaction ("T-T") methodology, would thenceforth be on a "case by case" basis. *See id*.

The DSMC point out, however, that Commerce never issued regulations specifying deadlines for when parties to an administrative review should request that the agency consider

---

[3] In remanding this issue, the court here acknowledges the briefing of defendant-intervenors BGY, Gang Yang Diamond Products, Inc. and Cliff International Ltd. to the effect that Commerce was "fully aware" of the *Advanced Technology* decision at the time it issued the *Final Results*, but the court does not perceive that as a reason, in itself, for denying Commerce's remand request.

calculating the margins under alternative methodology, *see generally id.,* nor in the *Second Review*, the review before the court under appeal, did Commerce issue any memoranda providing a deadline for such requests or otherwise indicate to the parties its expectations with respect to timing. The DSMC also point out that Commerce considered petitions to use the methodology in several administrative reviews in the months immediately leading up to the administrative briefing stage of this proceeding, again without articulating any specific practice in those cases with respect to timing of allegations, albeit (Commerce adds) prior to determining preliminary results in those instances.

        Commerce contends that when the DSMC filed their targeted dumping "allegation" in this matter , *i.e.,* about two months after the preliminary determination and 49 days before the statutory deadline for Commerce to file its final results, the briefing schedule for case and rebuttal briefs had already been set, and the timing of the allegation provided Weihai only 6 days to provide a rebuttal or response. In Commerce's view, this period was inadequate to address "such a complicated issue." Def's Resp. at 18. The defendant further argues that the DSMC recognize that "in practice" targeted dumping allegations "are typically" submitted at the preliminary stages of a proceeding, although the defendant also admits that Commerce's practice in this area is "evolving". *Id*. at 17-18, referencing Pl's Br. at 36-37.

        At any rate, Commerce found that the DSMC had ample opportunity to file its allegation prior to December 3, 2012, that the DSMC's filing was "prejudicial" and raised due process concerns, and that the "late filing" did not permit Commerce sufficient time to analyze the allegations. *See id*. at 18-19. In short, Commerce states that it declined to "spring" A-T methodology upon the parties for the first time in the final results, as a "*fait accompli*, depriving

them of any opportunity to provide input." *Id*. at 19. Nonetheless, the DSMC point out, one hundred and eleven days elapsed prior to the actual issuance of the *Final Results*, and Wehai did, in fact, provide substantive comment. In that post-briefing period, they also point out, the agency conducted further analysis of calculation issues regarding the valuation of Weihai's cores, *see infra*, and in connection therewith the DSMC note that Commerce solicited and obtained input from the parties after the normal briefing period had run. *See id*.; *see, e.g.*, *Second Review* I&D Memo at 23.

B

Be that all as it may, the court considers the statute, not the foregoing chronology, paramount. Pursuant to 19 U.S.C. §1677f-1(d)(1)(B), Commerce "may" determine whether subject merchandise is being sold in the United States at less than fair value utilizing A-T methodology "if . . . there is a pattern" of EP or CEP prices "that differ significantly among purchasers, regions, or periods of time" and Commerce "explains why such differences cannot be taken into account" using "normal" comparison methodology. Rather than request additional briefing of this targeted dumping issue in advance of the issuance of this opinion, in view of the fact that the matter is being remanded in any event (*see* above), Commerce on remand is requested to explain where in the statute or other authority it finds the non-ministerial discretion *not* to determine "*if*. . . there is a pattern" of differing EP or CEP prices based on the record as developed, with the assistance of interested parties, in these sorts of proceedings and regardless of whether an "allegation" is raised to that effect -- and notwithstanding the agency's statutory discretion to determine whether it will employ alternative methodology even "if" such a "pattern" is found. *Compare* 19 U.S.C. §1677f-1(d)(1)(B) *with*, *e.g.*, 19 U.S.C. §1673b(e)(1) ("[i]f a petitioner *alleges* critical circumstances . . .") *and* 19 U.S.C.

§1673d(a)(3) ("... in any investigation in which the presence of critical circumstances *has been alleged* . . ."); *cf. also* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 843, *reprinted in* 1994 U.S.C.C.A.N. 3773 ("In this regard, so that the exceptions are properly applied, the Administration intends that Commerce will continue to require that foreign companies report sales on a transaction specific basis, and that Commerce will request information on sales to particular customers and regions. Transaction-specific information *must* be made available so Commerce *may* determine: (1) the appropriate product and/or transaction categories for which averages should be calculated; *and* (2) whether the exception for targeted dumping is applicable.") (italics added). Commerce may attempt to persuade on remand as to the existence of reasonable ambiguity, but to this court that portion of the statute appears plain, and Commerce must reconsider the issue anew, *if* that is the correct result in consequence of this opinion.

### III

The DSMC also challenge Commerce's determination to alter the preliminary methodology it used to value steel sawblade cores used in Weihai's production.

### A

For merchandise imported from a non-market economy ("NME"), Commerce must derive normal value on the basis of the factor of production ("FOP") values utilized in producing the merchandise. 19 U.S.C. §1677b(c)(1). "[T]he particular aim of the statute is to determine the non-distorted cost of producing such goods" in order to derive the most accurate dumping margins

Court No. 13-00241                                                                                                         Page 9

possible. *Home Meridian International, Inc. v. United States*, 37 CIT ___, ___, 922 F. Supp. 2d 1366, 1371 (2013) (citation omitted).

Steel sawblade cores are produced from FOPS that include steel coil, labor, and electricity. In addition to being subject merchandise, steel sawblade cores are a type of FOP in their own right when consumed in producing finished sawblades. Weihai produced some steel sawblade cores in-house, purchased some from market economy ("ME") countries, and purchased the remainder from NME suppliers.

The defendant states that Commerce had to determine the value of the cores obtained "in each of these three ways" in order to calculate the normal value of Weihai's sawblades. Def's Resp. at 10. It avers Commerce "calculated the value of cores that Wehai produced in-house by identifying the surrogate value for the factors consumed in their production" and then "consistent with its policy for [ME] inputs, Commerce valued the cores that Weihai purchased from [ME] sources using the prices that Weihai actually paid."[4] Both the defendant and Weihai state that there is no dispute here as to valuation of Wehiai's in-house produced and ME-purchased cores (surrogate or otherwise), and that the dispute here concerns Commerce's surrogate valuation of Wehai's NME-

---

[4] Def's Resp. at 10-11, referencing *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61716, 61717-18 (Oct. 19, 2006) (explaining that where NME respondents can document purchases from market economy suppliers, Commerce may use the documented purchase prices a respondent actually paid for the input, in lieu of relying on the normal surrogate value methodology). *See Second Review* I&D Memo at 22-23; *see also Lasko Metal Prods. v. United States*, 16 CIT 1079, 1081, 810 F. Supp. 314, 317 (1992) ("[t]he cost for raw materials from a market economy supplier, paid in convertible currencies, provides Commerce with the closest approximation of the cost of producing the goods in a market economy country"); Weihai Resp. at 5. Weihai's response essentially repeats that this is indeed what Commerce has done, although its support for that proposition is simply to cite page 10 of the defendant's brief.

sourced cores, since NME home-market selling prices are presumed distorted by governmental interference. *See*, *e.g.*, *Taian Ziyang Food Co. v. United States*, 33 CIT 828, 835, 637 F. Supp. 2d 1093, 1105 (2009); *Magnesium Corp. of America v. United States*, 20 CIT 1092, 1113, 938 F. Supp. 885, 905 (1996).

The defendant contends that for these NME-sourced cores (*i.e.,* cores 1, 2, and 3) Commerce preliminarily determined to use the DSMC's proposed "multiplier" approach for their valuation. *See* Memorandum from Yang Jin Chun to The File, re: *Antidumping Duty Administrative Review on Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Analysis Memorandum for Weihai Xiangguang Mechanical Industrial Co., Ltd.*, PDoc 368, CDoc 310 (Dec. 3, 2012) ("*Weihai Preliminary Analysis Memo*").[5] The DSMC's description of this methodology is that it consists of calculating the simple average of Weihai's ME purchase prices for cores, calculating the simple average of Weihai's ME purchase prices for steel (the cores' primary input), calculating the percentage difference of the two averages, and then applying that percentage to the ME value of the steel that Weihai used in producing cores. Pls' Br. at 40, referencing *id*. at 4-5.

B

After publication of the preliminary results for this second administrative review, several months later Commerce published the final results for the first administrative review. *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 78 Fed. Reg. 11143

---

[5] The defendant explains that pursuant to administrative practice Commerce would have valued Weihai's NME-sourced cores based on the price of such cores from a surrogate country, but no such prices were available on the record, as there was no appropriate Harmonized Tariff Schedule provision for sawblade cores. *See Weihai Preliminary Analysis Memo* at 4-5.

(Feb. 15, 2013) ("*First Review*") and accompanying I&D Memo[6] at 25-26 (discussing surrogate value for sawblade cores). Therein, Commerce considered the similar issue as follows:

> According to the petitioner, the Department stated in [the final less than fair value investigation ("*LTFV Final*")] and the accompanying I&D Memo at Comment 11A that it could not rely on an HTS code covering cores and finished diamond sawblades (which are a downstream product from cores) to value cores because there was significant value added to the core in order to make a finished blade. The petitioner explains that the Department also found in *LTFV Final* and the accompanying I&D Memo at Comment 11A that cores are stamped pieces of the steel inputs. Thus, the petitioner suggests, the Department can construct a value for cores purchased from NME companies by reference to the values of the steel input and the prices Weihai has paid to market economy producers for cores.
>
> Specifically, the petitioner explains that Weihai's core 1 is made of steel 3 (65 MN NH steel), core 2 is made of steel 4 (SCM 435 H steel), and core 3 is made of steel 5 (SCM 435 NH steel). Moreover, the petitioner states that the Department valued steels 3, 4, and 5 independently using the surrogate value for steel 3 and [ME] purchase prices Weihai reported for steels 4 and 5. According to the petitioner, the difference between the input steel and the resulting core is yield loss, plus amounts for energy and labor, and this difference can be calculated using information on the record of this review. In particular, the petitioner claims that the [ME] purchase prices of cores 2 and 3 reflect the value added to steels 4 and 5 respectively and, taken together, they can be used to compute a simple average percentage multiplier representing the average conversion costs for all three cores. This multiplier would then be applied to the surrogate value for the corresponding type of steel. The petitioner argues that the surrogate value for cores used in the *Preliminary Results* does not reflect the value added to steel to produce a core.
>
> Finally, the petitioner explains that pursuant to *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 FR 61716, 61717-18 (October 19, 2006) (Market Economy Inputs Methodologies), the Department's practice is to value FOPs (1) using the [ME] prices of purchased inputs when those purchases account for more than 33 percent of the input purchases during the POR and (2) by averaging the [ME]

---

[6] Available at http://enforcement.trade.gov/frn/summary/prc/2013-03481-1.pdf (last visited on the date of this opinion). The defendant avers that the delay in issuance of final results for the first administrative review, which was "highly unusual" since Commerce is required by statute to have been completed before the results of the second review are completed, was necessitated due to the investigation of fraud allegations that were raised during that proceeding.

prices with the surrogate value when the [ME] purchase[s] are less than 33 percent. The petitioner requests that the Department, at least, use Weihai's market economy purchases of cores on a proportional basis regardless of the data it uses to value the remaining portion.

Department's Position:   For its self-produced cores, Weihai reported the FOPs it used to produce the cores, *i.e.*, steels, direct and indirect labor, and electricity.  In the *Preliminary Results*, we inadvertently applied the surrogate values for cores to both self-produced cores and purchased cores.  For the final results, we have valued the FOPs for Weihai's *self-produced* cores.  For Weihai's *purchased cores*, we agree with Weihai and the petitioner that HTS code 73261990 is not the best available information on the record for valuing cores.  For the final results, we have valued Weihai's *purchased cores* as follows.

Weihai purchased cores from [ME] economy countries and NME companies. The information on the record shows that the quantities of cores Weihai purchased from [ME] countries were not meaningful, *i.e.*, less than 33 percent of the total purchases of cores. Therefore, we valued Weihai's *purchased* cores using a quantity-weighted average of the prices Weihai paid for cores it purchased from [ME] countries and Weihai's FOPs for self-produced cores (to reflect the value of the cores Weihai purchased from NME suppliers).[ ]

* * *

*First Review* I&D Memo at 24-25 (citations omitted; italics and brackets added).

C

Shortly after issuance of the *First Review*, Commerce issued a certain "post-preliminary" memorandum from Gary Taverman, Senior Advisor, Antidumping and Countervailing Duty Operations to Paul Piquado, Assistant Sec'y for Import Administration, re: *Administrative Review of the Antidumping Duty Order on Diamond Sawblades and Parts Thereof From the People's Republic of China for the 2010-2011 Period: Post-Preliminary Analysis*, dated March 19, 2013.  PDoc 440 ("*Post-Prelim Memo*").  *See* Pl's Appx 14.  The parties here take the position that this memorandum indicated Commerce's intention to value Weihai's purchased cores for the *Second*

*Review*'s final results using the method Commerce had employed for the final results of the *First Review*. *See* Pl's Comments at 12; Def's Resp. at 13; Weihai's Resp. at 7; *see also* Letter from Wiley Rein LLP to Acting Sec'y of Commerce, re: *Diamond Sawblades and Parts Thereof from the People's Republic of China: Comments on Post-Preliminary Analysis Memorandum* (Mar. 26, 2013), PDoc 445 ("*DSMC Post-Prelim Memo*"), at 2-5 (contending that except for citation to the *First Review* the agency did not describe the reasons for abandoning the preliminary results, describe its new methodology, or provide any new calculations, and pleading that "the agency disclose updated calculations that would permit meaningful comments on the agency's proposal").[7]

      The DSMC then filed comments for the second administrative review that argued Commerce had not provided any reasoning for abandoning its preliminary methodology, and that the preliminary methodology was a sound and accurate method for valuing NME-purchased cores. *DSMC Post-Prelim Memo*, PDoc 445. The DSMC also requested that Commerce provide the parties with updated calculations that would permit them to review how the proposed change was to be implemented. *Id*. Weihai responded by reiterating arguments included in its February 19, 2013 administrative case brief against using the multiplier methodology. *See* Letter from Grunfeld, Desidero, Lebowitz, Silverman & Klestadt to Sec'y of Commerce, re: *Weihai-Ehwa's Rebuttal to Petitioner's Comments on the Post-Preliminary Analysis Memorandum in the Second Administrative*

---

[7] The referenced memorandum, as provided in the plaintiff's appendix, does not appear to reveal any such intention, only brief mention of the investigation of the fraud allegation concerning the *First Review* and preliminary determination that "respondents' sales and cost data are reliable" and (as the DSMC point out) invitation for comment, albeit on this post-preliminary "analysis" and not with respect to Commerce's alleged intention to alter the core valuation methodology for Weihai. *See* Pl's App'x 14 at 2. *Cf*., however, Memorandum from Yang Jin Chun to The File re *Diamond Sawblades and Parts Thereof from the People's Republic of China: Surrogate Values for the Final Results of Review* (June 10, 2013), PDoc 456 ("*Final SV Memo*").

*Review of the Antidumping Duty Order on Diamond Sawblades and Parts Thereof from the People's Republic of China, Case No. A-570-900* (Apr. 1, 2013), PDoc 446 ("*Weihai Post-Prelim Rebuttal*").

        In its *Second Review* I&D Memo, Commerce stated that because no Global Trade Atlas data for cores are available and Weihai did not purchase meaningful quantities of cores from market economy countries, *i.e.*, circumstances similar to those considered in the *First Review*, an alternative method was needed "to value the cores that Weihai purchased from NME suppliers." *Second Review* I&D Memo at 22 (citation omitted and italics added). Commerce then explained that, for that purpose,

> [c]onsistent with the prior review of this order, we are using Weihai's reported FOPs for self-produced cores.[ ] This methodology is based on Weihai's NME experience and, therefore, better reflects Weihai's experience of purchasing cores from NME suppliers than the methodology we used in the *Preliminary Results*.
>
> Our purpose of stating in the post-preliminary analysis our intent to change the methodology for the valuation of cores was to provide an opportunity for interested parties to comment on our intended methodology, not our calculations using the intended methodology, for the final results. We described the intended methodology, and cited to the additional details provided in the final results of the previous administrative review.[ ] Thus, parties had notice and opportunity to comment on the intended changes.

*Id.* at 22-23 (footnotes referencing *ARI Final* I&D Memo at Comment 11 omitted). In yet another memorandum, dated contemporaneously with the final results for *Second Review*, Commerce added:

> This memorandum outlines the changes in the final results to the methodology and selection of surrogate values used in the calculation of normal value and U.S. price for the preliminary results . . ..
>
>                                 * * *
>
> . . . We recalculated the surrogate values for cores Weihai purchased from [NME] suppliers. We valued cores Weihai purchased from NME suppliers using Weihai's reported FOPs for self-produced cores. For cores that it produced, Weihai reported inputs for steel, labor, and electricity. First, we calculated the average of the input Weihai reported for each of these three FOP categories. Then we multiplied each

>   average by the applicable per-unit surrogate value to calculate the total surrogate value for each input.  Then we added the total surrogate value for each input to calculate the per-unit surrogate value for cores Weihai purchased from NME suppliers.

*Final SV Memo* at 1-2 (court's bracketing), referencing *Second Review* I&D Memo at cmt. 8.

D

In anticipation of this opinion the court has considered, *intrinsecus*, the parties' arguments on this issue as briefed.  In the interest of brevity, and to avoid further obfuscation, the court concludes: that the DSMC's arguments are persuasive; that this is not a case of "less than ideal clarity" that may be sustained "if the agency's path may reasonably be discerned", *see Bowman Transp. Inc. v. Arkansas Best Freight System*, 419 U.S. 281, 286 (1974); and that the matter cannot be sustained on the basis of *post-hoc* rationale articulated in the briefs.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943).

In particular, it is unclear whether Commerce's methodology in the second administrative review is in fact consistent with the expressed methodology in the first administrative review.  No opinion is here expressed on the reasonableness of the methodology employed in the *First Review*, but in that review is described the application of a single weighted-average formula to value all of Weihai's purchased cores, both ME and NME.  The *Second Review* I&D Memo describes valuation of Weihai's NME-purchased cores separately, apart from the value assigned to Weihai's ME-purchased cores, "using Weihai's reported FOPs for self-produced cores."[8]  Regardless

---

[8] The *Final SV Memo* provides more detail thereof, although it does not, contrary to the defendant's restatement, employ such precise terms as "usage rates", *etc*., to describe what Commerce has done with respect to "the average of each input" multiplied by "the applicable per-unit surrogate value" in order to obtain "the total surrogate value for each input."

of the arguments thereon in the parties' administrative and post-preliminary briefs, the court has no basis for forming an opinion, from the explanations provided in (and for) the *Second Review* and the briefs before the court, on whether the methodology and results of the *Second Review* are "consistent" with the *First Review*, *i.e.*, whether those review determinations are consistent from a logical or mathematical perspective, or whether the final results of the *Second Review* are the "more accurate" as compared with the preliminary determination even if they are, *arguendo*, consistent with the results of the *First Review*. At least the issue must be remanded for clarification and further explanation, with particular attention paid and explanation provided as to why the methodology chosen from among available alternatives produces the more accurate and undistorted dumping margin as compared with the preliminary methodology. *See*, *e.g.*, *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 37 CIT ___, Slip Op. 13-30 at 10 (2013); *Mittal Steel Galati, S.A., v. United States*, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308-09 (2007).

On remand, therefore, Commerce is hereby ordered: (1) to explain how the *Second Review* methodology for valuing Weihai's cores (purchased or produced) is "consistent" with the *First Reivew*; (2) to explain (a) why, given that companies operating with an NME are presumed distorted, "Weihai's NME experience . . . better reflects Weihai's experience of purchasing cores from NME suppliers than the methodology [Commerce] used in the Preliminary Results" and why that is a desirable goal, notwithstanding the absence of a challenge to Weihai's reported FOPs for its self-produced cores; and (3) to provide to the parties a full explanation of its chosen methodology in its draft final results of redetermination, together with either the calculations for the proposed final methodology or the relevant computer programming language that would encompass the same (since

those calculations and/or the intended program appear integral not only to validating whether the computed output adheres to the described methodology but also to understanding the latter in the first place) or provide a full explanation detailing why release of either of those should be considered inappropriate (or otherwise) for comment on both the final determination and the draft final results of redetermination.

Notwithstanding the foregoing, of course, Commerce is not precluded from reconsidering the issue anew, should it choose to do so in its discretion.

*Conclusion*

In accordance with the foregoing, *Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 36166 (Jun. 17, 2013) ("*Final Results*"), *as amended*, 78 Fed. Reg. 42930 (Jul. 18, 2013), is hereby remanded to the International Trade Administration, U.S. Department of Commerce for further proceedings not inconsistent with this opinion. The results of remand shall be due January 15, 2015. Within five (5) business days of such filing, the parties shall confer concerning a joint proposed scheduling order for comments, if any, on the results of remand, or indication of none, which the plaintiff shall submit by such time.

**So ordered**.

/s/ R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: September 23, 2014
      New York, New York